## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| CHARLIE MARTINEZ, | ) | |
| | ) | |
| Plaintiff, | ) | 8:05CV325 |
| | ) | |
| vs. | ) | ORDER |
| | ) | |
| ROBERT HOUSTON, Director of | ) | |
| Douglas County Corrections, and | ) | |
| COUNTY OF DOUGLAS, NEBRASKA, | ) | |
| | ) | |
| Defendants. | ) | |

This matter is before the court on the defendants' Motion for Summary Judgment (Filing No. 49).[1] The defendants filed a brief (Filing No. 52) and an index of evidence (Filing Nos. 50 and 51) in support of the motion. The plaintiff filed a brief (Filing No. 68), with an attached unpublished opinion, and an index of evidence (Filing Nos. 69, 70 and 71) in opposition to the motion. The defendants filed a brief (Filing No. 77) and an index of evidence (Filing No. 76) in reply.

## INTRODUCTION

The plaintiff, a Hispanic male, is pursuing claims against his current employer based upon allegations of violations of his civil rights arising under Title VII of the Civil Rights Act of 1964, as amended 42 U.S.C. § 2000e, 42 U.S.C. § 1983, and Nebraska law, Neb. Rev. Stat. § 48-1104, *et seq.* The plaintiff alleges he suffered discrimination, retaliation and a hostile work environment based on his race, color or national origin and his association with the African American Correctional Officer's Association (AACOA). The plaintiff works for the Douglas County Department of Corrections (the Department), an agency of Douglas County, Nebraska.

The plaintiff alleges he suffered disparate treatment depriving him of his right to equal protection under the Fourteenth Amendment to the Constitution of the United States, brought pursuant to 42 U.S.C. §1983 (Claim I) and Title VII (Claim III). The plaintiff also alleges he was retaliated against for reporting discriminatory conduct in violation of Title VII

---

[1] The undersigned magistrate judge exercises jurisdiction over this matter after consent by the parties and transfer by United States Chief District Court Judge Joseph F. Bataillon. **See** Filing No. 85.

(Claim II).  The plaintiff alleges he was subjected to a hostile work environment when his employer knew of discrimination and failed to take proper remedial action (Claim IV).  Additionally, the plaintiff alleges he was denied promotions because of his race and/or his opposition to unlawful discrimination in violation of Title VII (Claim V) and Neb. Rev. Stat. § 48-1104, *et seq.* (Claim VI).  In connection with the plaintiff's claims he sought punitive damages.  The defendants seek summary judgment on all six of the plaintiff's claims and his request for punitive damages.  The plaintiff opposes the motion, except he concedes he is barred from the recovery of punitive damages against these defendants.  **See** Filing No. 68, p. 43-44.

### UNCONTROVERTED FACTS

1.      The plaintiff is a Hispanic native of Honduras and at all relevant times to this action was employed by the Department as a correctional officer.  **See** Filing No. 32 - Amended Complaint ¶¶ 7-8.

2.      Defendant County of Douglas, Nebraska, is a political subdivision of the State of Nebraska.  The Department is an agency of Douglas County, Nebraska.  *Id.* ¶ 3.

3.      Defendant Robert Houston, sued in his official capacity, served as Interim Director of the Department from approximately April of 2003 to September of 2003, and then as Director from September of 2003 to approximately March of 2005.  **See** Filing No. 38 - Amended Answer ¶ 3.

4.      The plaintiff began working for the Department as a Corrections Officer I (COI) in June of 2002.  The plaintiff was promoted to Corrections Officer II (COII), effective May 30, 2004, and is currently serving in that capacity.  **See** Filing No. 50, Exhibit 1 ¶ 7.

5.      The plaintiff reported to the Department that on January 12, 2003, Officer Mike Frudiker (white male) "grabbed his shoulders," "threatened to assault" him and called him a "f---ing spic."  Reports were collected from all parties who were known to have any knowledge of the incident.  In a report dated January 17, 2003, one witness to the incident confirmed he heard Officer Frudiker call the plaintiff a "spic."  On February 19, 2003, after a hearing, Officer Frudiker was suspended for one day without pay.  *Id.* Exhibit 1, ¶ 8; Exhibits 7-9.

6.      During the investigation into the plaintiff's claim against Officer Frudiker, Officer Frudiker claimed the plaintiff referred to him as a "racist ignorant cracker" on the

2

same date.  There were no other witnesses to the alleged comment made by Officer Martinez.  The plaintiff was cleared of any wrong-doing and no disciplinary action was taken against him.  *Id.* Exhibit 1 ¶ 9; Exhibits 10-11.

7.     On January 20, 2003, the plaintiff reported that Officer Robert Lewis (African American male) told the plaintiff that Officer Steven Amweg (white male), referred to the plaintiff as "Mexican boy."  Reports were collected from all parties who were known to have any knowledge of the incident.  Officer Amweg admitted he made the statement, on January 17, 2003, but stated he did not mean any harm by it.  On February 12, 2003, after a hearing, Officer Amweg was suspended for one day without pay.  *Id.* Exhibit 1 ¶ 10; Exhibits 12-13.

8.     On January 20, 2003, the plaintiff reported that he received anonymous internal phone calls at work where the caller referred to him as a "spic."  The plaintiff alleged he believed he recognized one of the voices as that of Officer Matthew Faircloth (white male).   Reports were collected from all parties who were known to have any knowledge of the incident on January 20 and 21, 2003.  Officer Faircloth denied making the calls but stated that Officer Brammer (white male) told him he made one phone call to the plaintiff that day "to play a joke on him."  Officer Brammer denied making the phone call(s).  On February 12, 2003, the Department determined no disciplinary action would be taken against Officer Brammer because the allegations could not be substantiated (there were no corroborating witnesses to the alleged phone calls).  *Id.* Exhibit 1 ¶ 11; Exhibits 14-17.

9.     On March 24, 2003, the plaintiff reported that his vehicle had been vandalized while parked at work.  The plaintiff did not identify any possible suspects in his written report.  The parking lots in question are not secured and are accessible by the public.  There are cameras monitoring the lots but the cameras do not automatically record.  The plaintiff was told to contact the Omaha Police Department to file a report, which he did.  It is standard practice for the Department to refer employees to the Omaha Police Department when reporting vandalism to private vehicles.  If an employee had been identified as the perpetrator, disciplinary action would have been initiated.  However, no one was ever identified as the perpetrator.  **See** Filing No. 50, Exhibit 1 ¶ 12 and Exhibit 18.

10.    On or about September 23, 2003, the Department posted an internal opening for an Investigator position in the Office of Professional Responsibility.  The position would not result in an increase in compensation for the person selected.  Rather, it was a

3

temporary assignment within the officer's current rank.  **See** Filing No. 50, Exhibit 2 ¶¶ 4-5; Filing No. 51, Exhibits 29 and 30.

11.    The posting for the OPR position stated preference would be given to Correctional Officer II's (COII) and Correctional Officer III's (COIII).  Fourteen employees, including the plaintiff, applied for the position.  Of the fourteen applicants, eleven were COIII's, one was a COII and two were COI's.  **See** Filing No. 50, Exhibit 2 ¶¶ 6-7; Filing No. 51 Exhibits 30 and 31.

12.    At the time of the interviews, the plaintiff was a COI.  He was also the least senior of all the applicants, having only been employed with the Department since June of 2002.  **See** Filing No. 50, Exhibit 2 ¶ 8.

13.    An interview committee conducted the interviews and forwarded its top three recommendations for each position to Director Houston for final selection and approval. Sgt. Matthew Wheeler was considered the most qualified for the position by the committee and Director Houston selected him for the position.  At the time, Matthew Wheeler was a COIII (Sergeant) and had served in that capacity since 1999.  Sgt. Wheeler had been an employee with the Department since August of 1994.  Sgt. Wheeler also had experience as a private security investigator and, at the time, was also a Douglas County reserve deputy.  **See** Filing No. 50, Exhibit 2 ¶¶ 9-10; Filing No. 51, Exhibit 32.

14.    On November 16, 2003, the plaintiff was involved in an incident with an inmate by the name of Richard Johnson.  The plaintiff completed a disciplinary misconduct report on the inmate.  Within the report, the plaintiff stated that when Inmate Johnson came at him, he "managed to grab [the inmate] by his neck and slam him on the floor."  **See** Filing No. 50, Exhibit 1 ¶ 13 and Exhibit 19.

15.    Inmate Johnson requested that law enforcement be contacted so he could file a criminal complaint against the plaintiff in regard to the November 16, 2003 incident. When an inmate requests to file a criminal complaint against an officer it is standard procedure for the Department to contact the Douglas County Sheriff's Department.  In this case the Sheriff's Department investigated the inmate's allegations but determined there was no cause for criminal charges to be brought against the plaintiff.  **See** Filing No. 50, Exhibit 1 ¶ 14 and Exhibit 20.

16.    The Office of Professional Responsibility (OPR) also investigated to determine whether any Departmental rules or policies had been violated during the

4

November 16, 2003 incident.  Sgt. Carter, OPR Investigator, directed Sgt. Wilson to gather written reports from the inmates who witnessed the incident.  After investigation, OPR notified the plaintiff he had been accused of violating departmental policy and that a pre-disciplinary hearing would be held to discuss the charges and his explanation of the same.  After the pre-disciplinary hearing, the plaintiff was notified that the charges were not sustained and that no disciplinary action would occur.  The plaintiff was told to attend retraining in use of force techniques.  **See** Filing No. 50, Exhibit 1 ¶ 15 and Exhibit 21; Filing No. 51, Exhibit 22.

17.    At all times relevant to this lawsuit the Department had a Sick Leave Committee who was charged with reviewing employees' sick leave usage.  On November 24, 2003, the plaintiff was counseled for using four days of sick leave on the same day of the week (Sunday).  **See** Filing No. 50, Exhibit 2 ¶14; Filing No. 51, Exhibits 36-38.

18.    On March 29, 2004, the plaintiff was involved in an incident with an inmate by the name of Kenya Andrews.  Officer Michael Wegner filed two Informational Reports. The second report stated he witnessed the plaintiff hitting the inmate in the head.  Another witness also reported she saw the plaintiff hitting the inmate.  On April 29, 2004, OPR notified the plaintiff he had been accused of violating departmental policy and that a pre-disciplinary hearing would be held on May 7, 2004, to discuss the charges and his explanation of the same.  **See** Filing No. 50, Exhibit 1 ¶ 16; Filing No. 51, Exhibits 23-25.

19.    A disciplinary hearing committee conducted the pre-disciplinary hearing.  The committee unanimously recommended to Director Houston that the plaintiff be terminated. On May 13, 2004, the plaintiff was terminated for violating departmental policy.  **See** Filing No. 50, Exhibit 1 ¶¶ 17-18; Filing No. 51, Exhibits 26-27.

20.    Pursuant to the Douglas County Civil Service Commission procedures and the civil service state statutes, the plaintiff appealed his termination to the Douglas County Civil Service Commission.   **See** Filing No. 50, Exhibit 1 ¶ 17 [sic] (after ¶ 18).

21.    On or about June 16, 2004, the plaintiff filed a charge with the Nebraska Equal Opportunity Commission.  **See** Filing No. 32 - Amended Complaint ¶ 5.

22.    On September 23, 2004, the Douglas County Civil Service Commission held a hearing to review the plaintiff's termination.   Without listening to any evidence or testimony on the merits of the termination, the Commission found that the Department had failed to initiate disciplinary action against the plaintiff within 30 days as was required by his

union contract.  Because of this procedural error, on September 23, 2004, the Commission reinstated the plaintiff with reimbursement of pay and benefits to May 13, 2004.  **See** Filing No. 50, Exhibit 1 ¶ 17 [sic] (after ¶ 18); Filing No. 51, Exhibit 28.

23.     On November 8, 2004, the Department posted an internal opening for temporary assignment to the Work Release Center.  Interested officers had until November 19, 2004, to apply for the assignment.  The position would not result in an increase in compensation for the person selected.  To be eligible for consideration the officer must have had six months or more experience as a Correctional Officer II.  On November 19, 2004, the plaintiff did not have six months or more experience as a Correctional Officer II.  Since the plaintiff was promoted to a Correctional Officer II on May 30, 2004, he did not meet the minimum qualifications for the position and was not interviewed.  **See** Filing No. 50, Exhibit 3 ¶¶ 3-6; Filing No. 51, Exhibit 40.

24.     On or about January 13, 2005, the Department posted an internal opening for temporary assignment as Classification Officer.  The plaintiff was selected for one of the Classification positions and served in that capacity until approximately September 19, 2005.  **See** Filing No. 50, Exhibit 2 ¶¶ 11-12; Filing No. 51, Exhibits 34-35.

25.     In 2005, the sick leave policy provided for supervisor counseling when an employee had four unexcused (not excused with a physician's note) incidents of sick leave usage during a six-month period.  When the Sick Leave Committee reviewed the plaintiff's sick leave usage in August of 2005, his Data Calendar showed seven incidents of unexcused sick leave usage for the preceding six-month period.  Pursuant to the policy, the Committee requested that Sgt. Rogers discuss the matter with the plaintiff.  Sgt. Rogers stated on the Sick Leave Counseling Record, dated August 8, 2005, that the plaintiff provided doctors' notes for the absences and that no action would be taken.  **See** Filing No. 50, Exhibit 2 ¶¶ 15-17; Filing No. 51, Exhibits 38-39.

26.     On or about August 30, 2005, plaintiff filed a second charge with the Nebraska Equal Opportunity Commission.  **See** Filing No. 32 - Amended Complaint ¶ 6.

27.     In 2006, the plaintiff applied and was interviewed for another temporary specialty assignment at the Work Release Center.  On or about September 24, 2006, he was selected for temporary assignment to that position and currently serves in that capacity.  **See** Filing No. 50, Exhibit 3 ¶ 8.

## LEGAL STANDARD

Pursuant to the Federal Rules of Civil Procedure, summary judgment is appropriate when, viewing the facts and inferences in the light most favorable to the nonmoving party, "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." **See** Fed. R. Civ. P. 56(c); **Nat'l Am. Ins. Co. v. W & G, Inc.**, 439 F.3d 943, 945 (8th Cir. 2006).  When making this determination, a court's function is not to make credibility determinations and weigh evidence, or to attempt to determine the truth of the matter; instead, a court must "determine whether there is a genuine issue for trial." **Anderson v. Liberty Lobby, Inc.**, 477 U.S. 242, 249 (1986).  A court must "look to the substantive law to determine whether an element is essential to a case, and '[o]nly disputes over facts might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.'" **Chambers v. Metro. Prop. & Cas. Ins. Co.**, 351 F.3d 848, 853 (8th Cir. 2003) (**quoting Anderson**, 477 U.S. at 248).  "One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses, and [the rule] should be interpreted in a way that allows it to accomplish this purpose." **Celotex Corp. v. Catrett**, 477 U.S. 317, 323-24 (1986).

Additionally, Rule 56(e) provides:

> When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial.  If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party.

**See** Fed. R. Civ. P. 56(e).  A party seeking summary judgment bears the burden of informing a court "of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." **Celotex**, 477 U.S. at 323 (**quoting** Fed. R. Civ. P. 56(c)); **Rodgers v. City of Des Moines**, 435 F.3d 904, 908 (8th Cir. 2006).  In the face of a properly supported motion, the burden then shifts to the nonmoving party to "set forth specific facts showing there is a genuine issue for trial." Fed. R. Civ. P. 56(e); **Murphy v. Missouri Dep't of Corr.**, 372 F.3d 979, 982 (8th Cir. 2004).  A motion for summary judgment places an affirmative

burden on the non-moving party to go beyond the pleadings and, by affidavit or otherwise, produce specific facts that show that there is a genuine issue for trial.  **See** Fed. R. Civ. P. 56(e); ***Janis v. Biesheuvel***, 428 F.3d 795, 799 (8th Cir. 2005)

Under this court's local rules:

> The moving party shall set forth in the brief in support of the motion for summary judgment a separate statement of material facts as to which the moving party contends there is no genuine issue to be tried and that entitle the moving party to judgment as a matter of law.

**See** NECivR 56.1(a)(1).

Additionally:

> The party opposing a motion for summary judgment shall include in its brief a concise response to the moving party's statement of material facts.  The response shall address each numbered paragraph in the movant's statement and, in the case of any disagreement, contain pinpoint references to affidavits, pleadings, discovery responses, deposition testimony (by page and line), or other materials upon which the opposing party relies.  Properly referenced material facts in the movant's statement will be deemed admitted unless controverted by the opposing party's response.

**See** NECivR 56.1(b)(1).


## ANALYSIS

### A.   Failure to Promote

In the plaintiff's Fifth and Sixth Claims for Relief, the plaintiff alleges the defendants discriminated against the plaintiff and "retaliated against the Plaintiff for making or supporting a charge of discrimination, by denying him promotions for which he had applied, and, had been well qualified."  **See** Filing No. 32, p. 13-14.  These claims are alleged pursuant to Title VII and the Nebraska Fair Employment Practices Act (NFEPA), Neb. Rev. Stat. § 48-1104 and § 48-1114.  Specifically, the plaintiff contends he applied for and was denied promotions to two job assignments, one in November 2003 and a second in November 2004.  **See** ***id.*** ¶¶ 18, 37 and 38.

The defendants deny the plaintiff was subject to discrimination or retaliation with regard to denial of reassignment in November 2003 or November 2004.  Specifically, the defendants argue (1) the assignments would have been lateral reassignments, rather than

promotions, and (2) the plaintiff was the least senior applicant or not qualified for the job assignments at issue.

> To establish a prima facie case of racial discrimination in a failure-to-promote claim, a plaintiff must show (1) she is a member of a protected group; (2) she was qualified and applied for a promotion to an available position; (3) she was rejected; and (4) similarly situated employees, not part of the protected group, were promoted instead. . . . . If a prima facie case is established, the burden of production shifts to the employer, who must rebut the presumption of discrimination with evidence that the plaintiff was rejected, or someone else was preferred, for a legitimate, non-discriminatory reason. A plaintiff may nonetheless prevail by presenting credible evidence the employer's stated reasons are pretextual.

*Allen v. Tobacco Superstore, Inc.*, 475 F.3d 931, 937 (8th Cir. 2007).

The framework is similar for the plaintiff's claim regarding retaliation. However, "[t]o establish a prima facie case of retaliation, [the plaintiff] must show that he engaged in statutorily protected activity, that [the defendant] took adverse action against him and that there is a causal connection between the two. Statutorily protected activity includes opposing an act of discrimination made unlawful by Title VII." *Pope v. ESA Servs., Inc.*, 406 F.3d 1001, 1010 (8th Cir. 2005); **see** *Allen*, 475 F.3d at 939 (regarding failure to promote in retaliation for filing a charge of discrimination with the EEOC).

### 1.    Lateral Assignments

The defendants provide unrebutted evidence that the Department had several temporary specialty assignments within the Department and there is no additional compensation for appointment to a specialty assignment. **See** Filing No. 50, Exhibit 2 ¶ 2; Filing No. 51, Exhibit 29 ¶ IV(B). The assignments are a specialty duty post within the officer's current rank. **See** *id.* Accordingly, the defendants maintain the specialty assignments sought by the plaintiff were not "promotions" and are more appropriately described as transfers. In contrast, the plaintiff argues the specialty assignments he sought should be considered promotions because the assignments would have furthered his knowledge and prestige, broadened his skills and enhanced his opportunities for promotion. The plaintiff acknowledges the positions did not involve an increase in pay.

In general, a lateral transfer, or the refusal to make a lateral transfer, is not a materially adverse action. "In cases where the sought position is a lateral transfer, without additional material benefits or prestige, it would be improper to conclude that a denial of such a transfer would be a materially adverse action." *Mitchell v. Vanderbilt Univ.*, 389 F.3d 177, 183 (6th Cir. 2004) (noting employees failure to introduce evidence showing that denials of lateral transfer requests resulted in materially adverse changes in terms of employment could not establish adverse employment action); **see also *O'Neal v. City of Chicago***, 392 F.3d 909, 912-13 (7th Cir. 2004) (explaining that an employee's "purely subjective preferences for one position over another" does not "justify trundling out the heavy artillery of federal antidiscrimination law" (internal quotations omitted)); *Sanchez v. Denver Pub. Sch.*, 164 F.3d 527, 532-33 n.6 (10th Cir. 1998). In contrast, the plaintiff can show a materially adverse action where the failure to transfer, even "with no change in financial terms significantly reduces the employee's career prospects by preventing her from using her skills and experience, so that the skills are likely to atrophy and her career is likely to be stunted." *O'Neal*, 392 F.3d at 911. In such a case involving future harm, the plaintiff must still show more than a minor change in working conditions or that the transfer involves a promotion in form or substance. **See *id.*;** *Duffy v. McPhillips*, 276 F.3d 988, 992 (8th Cir. 2002); *Williams v. Bristol-Myers Squibb Co.*, 85 F.3d 270, 274 (7th Cir. 1996).

It remains the plaintiff's burden to show the sought position would result in a material change by submitting evidence in support of the allegation. **See *Williams v. R.H. Donnelley, Corp.***, 368 F.3d 123, 128 (2d Cir. 2004) (Employee must establish the defendant's "denial of her request for a transfer created a materially significant disadvantage in her working conditions."); *O'Neal*, 392 F.3d at 912 (rejecting for lack of "objective evidence" the employee's claims that her involuntary transfer resulted in a less prestigious job and negatively affected her advancement opportunities); *Kocsis v. Multi-Care Management, Inc.*, 97 F.3d 876, 887-88 (6th Cir. 1996) (employee failed to submit evidence or make any real attempt to compare positions). However, a higher level of qualifications needed for a position may be an indication of the position's prestige. *White v. Burlington N. & Santa Fe Ry. Co.*, 364 F.3d 789, 803 (6th Cir. 2004) (en banc). Additionally, the plaintiff may show the position had increased supervisory status, had more

opportunities for salary increases or advancement. *Davis v. City of Sioux City*, 115 F.3d 1365, 1369 (8th Cir. 1997).

The plaintiff has failed to show the positions he sought for temporary assignment in either the Office of Professional Responsibility or the Work Release Center were more than lateral transfers without additional material benefits or prestige. The plaintiff provides no evidence tending to show assignment to these temporary positions would provide additional opportunities to the plaintiff or that he suffered a material disadvantage by remaining in his previous assignment. To the contrary, the plaintiff later received temporary reassignments and a promotion. Accordingly, the court finds the plaintiff has failed to show he suffered an adverse employment action or was denied a promotion with regard to the two temporary assignments he sought in 2003 and 2004.

### 2.    Minimum Qualifications

The plaintiff alleges he was denied a promotion to a position in the Work Release Center in November of 2004. On November 8, 2004, a position was posted for temporary specialty assignment to the Work Release Center. **See** Filing No. 50, Exhibit 3 ¶ 3. Interested officers had until November 19, 2004, to apply for the assignment. *Id.* One of the objective criteria for eligibility for consideration was that the officer must have had six months or more experience as a Corrections Officer II. *Id.* ¶ 4; Filing No. 51, Exhibit 40.

The defendants state the plaintiff was not considered for the position because the plaintiff did not have six months or more experience as a Corrections Officer II by November 19, 2004. The plaintiff had been promoted to Corrections Officer II, effective May 30, 2004. **See** Filing No. 50, Exhibit 1 ¶ 7. The plaintiff does not dispute the objective criterion or that he did not have the required eligibility. Instead, the plaintiff contends "one of the reasons he was not given an opportunity to even interview was because of the complaints he had raised about how he was being treated." **See** Filing No. 68, p. 24.

"In cases in which the positions in question are not posted, a plaintiff 'has a lighter burden when attempting to make a prima facie case of failure to promote than in a situation involving objective promotions criteria.'" *Turner v. Honeywell Fed. Mfg. & Tech., LLC*, 336 F.3d 716, 720-21 (8th Cir. 2003) (**quoting** *Lyoch v. Anheuser-Busch Cos., Inc.*, 139 F.3d 612, 615 (8th Cir. 1998)). However, in this case the objective promotions criteria

excluded the plaintiff from consideration for the posted position.  Accordingly, the plaintiff fails to show he was qualified for the position in Work Release Center in November of 2004.

### 3.    Pretext/Causation

The plaintiff alleges he was denied a promotion to a position in the OPR in November 2003.  On or about September 23, 2003, the Department posted openings for temporary specialty assignments, one of the positions was that of an Investigator in the OPR to begin on November 9, 2003.  **See** Filing No. 51, Exhibit 30.  The posting for the OPR position stated preference would be given to COII's and COIII's.  **Id.**  Fourteen employees, including the plaintiff, applied for the position.  **See** Filing No. 50, Exhibit 2 ¶ 7.  Of the fourteen applicants, eleven were COIII's, one was a COII and two were COI's.  **Id.**; Filing No. 51, Exhibit 31.  At the time of the interviews, the plaintiff was a COI.  **See** Filing No. 50, Exhibit 2 ¶ 7.  The plaintiff was also the least senior of all the applicants, having only been employed with the Department since June of 2002.  **Id.**

An interview committee conducted the interviews and forwarded its top three recommendations for each position to Director Houston for final selection and approval.  **See** Filing No. 51, Exhibit 32.  Matthew Wheeler, a COIII (Sergeant) was their top recommendation because he was considered the most qualified for the position at the time.  **See** Filing No. 50, Exhibit 2 ¶ 10.  Sgt. Wheeler had been an employee with the Department since August of 1994, and a COIII since May of 1999.  **Id.**  He also had experience as a private security investigator and, at the time, was also a Douglas County reserve deputy.  **Id.**

The plaintiff does not dispute Sgt. Wheeler's level of experience.  The plaintiff contends he had an impressive amount of experience in each of the key areas for the position.  The plaintiff argues that, at a minimum, he should have been listed as one of the top three candidates for the position.  Accordingly, the plaintiff argues the defendants' stated reason for not promotion the plaintiff is pretext for discrimination.

"[A]n employer's selection of a less qualified candidate 'can support a finding that the employer's nondiscriminatory reason for the hiring was pretextual,' it is the employer's role to '[i]dentify[ ] those strengths that constitute the best qualified applicant.'"  ***Kincaid v. City of Omaha***, 378 F.3d 799, 805 (8th Cir. 2004) (**citing *Duffy v. Wolle*,** 123 F.3d 1026,

1037-38 (8th Cir. 1997)).  The defendants have identified how Sgt. Wheeler was more qualified than the plaintiff for the position.  The plaintiff has failed to show that he was more qualified than any of the other candidates, particularly the three sergeants listed as the top three candidates.  Accordingly, the plaintiff fails to show the defendants' stated reason for the failure to assign him to his desired position was pretext for discrimination.

Similarly, the plaintiff fails to show a causal connection between his failure to attain the position and his charge of discrimination.  "An inference of a causal connection between a charge of discrimination and [an adverse action] can be drawn from the timing of the two events, but in general more than a temporal connection is required to present a genuine factual issue on retaliation."  *Peterson v. Scott County*, 406 F.3d 515, 524-25 (8th Cir. 2005) (engaging in protected activity within two weeks of adverse action is close enough to establish causation in a prima facie case) (internal citations omitted).  Here, the plaintiff alleged discrimination in January 2003, but was denied his preferred job assignment in November 2003.  Accordingly, without more no inference can be drawn from the timing of the two events.

For the reasons stated above, the plaintiff has failed to establish a prima facie case of racial discrimination or retaliation with regard to two promotions, in November of 2003 or November of 2004.  Additionally, assuming the plaintiff had established a prima facie case, the plaintiff has failed to show the defendants' stated reasons for the failure to reassign the plaintiff as requested were pretext for discrimination.   Therefore, the defendants are entitled to summary judgment on the plaintiff's Fifth and Sixth Claims for Relief.

### B.     Nebraska Fair Employment Practices Act

In the alternative, the defendants contend the court should grant summary judgment on the plaintiff's Sixth Claim for Relief because the plaintiff failed to meet the procedural requirements of § 48-1119(4) of the NFEPA.  The defendants note the Equal Employment Opportunity Commission issued a right to sue letter on September 28, 2006, and the plaintiff's amended complaint was filed afterward, on October 10, 2006. The defendants contend the letter was an administrative dismissal of the claim and thus the NFEPA claim is untimely because the NFEPA provides:

> A complainant who has suffered physical, emotional, or financial harm as a result of a violation of section 48-1104 or 48-1114 may, at any stage of the proceedings **prior to dismissal**, file an action directly in the district court of the county where such alleged violation occurred.

Neb. Rev. Stat. § 48-1119(4) (emphasis added).

In an unpublished opinion by the Nebraska District Court, the court held:

> the word "dismissal," as used in the first sentence of Neb. Rev. Stat. § 48-1119(4) (Reissue 1998), means a dismissal on the merits. Such a dismissal on the merits could occur upon (1) an initial determination that there is not reasonable grounds to believe that the charge is true, (2) a formal order following a contested hearing, or, (3) a dismissal because of the complainant's failure to cooperate with the commission or its investigators or staff. The court also concludes that the word "dismissal" does not mean or include an administrative closure of the case pursuant to notice that the complainant intends to directly file an action in court.

*Engelhaupt v. Farm Credit Servs. of Midlands*, 2000 WL 33934231, *1 (Neb. Dist. Ct. Feb. 1, 2000).

This court agrees with the reasoning found in *Engelhaupt* and finds the plaintiff's NFEPA claim was timely filed. Furthermore, because the plaintiff was given a right to sue letter, the plaintiff's situation is different from the situation in those cases cited by the defendants. **See** *Hassler v. Alegent Health*, 198 F. Supp. 2d 1108, 1111-12 (D. Neb. 2002) (NEOC dismissal of claim after a Commission Determination finding no reasonable cause). Accordingly, the court will not grant the defendants' motion for summary judgment as to the Sixth Claim for Relief on this ground.

## C.    Disparate Treatment

In the First Claim for Relief, the plaintiff alleges he was deprived of his right to equal protection of the laws, as guaranteed by the Fourteenth Amendment to the Constitution of the United States. More specifically, the plaintiff claims the defendants violated his right to equal protection by subjecting him to disparate treatment by the use of formal policies, practices, and customs followed by management. **See** Filing No. 32. Similarly, the Third Claim for Relief alleges disparate treatment due to discrimination because of the plaintiff's race/color and national origin and his association with the AACOA. *Id.* The plaintiff brought

the First Claim for Relief pursuant to 42 U.S.C. § 1983 and the Third Claim for Relief pursuant to Title VII, 42 U.S.C. § 2000e-2(a).

The defendants may be liable under § 1983 only if the plaintiff establishes he was deprived of a right "secured by the Constitution and laws" of the United States, and (2) the deprivation was caused by a person or persons acting under color of state law.  42 U.S.C. § 1983; *Flagg Bros., Inc. v. Brooks*, 436 U.S. 149, 155 (1978).  In addition, to impose liability under § 1983 on a local government, the plaintiff is required to identify either an official municipal policy or a widespread custom or practice that caused the plaintiff's injury. *Springdale Educ. Ass'n v. Springdale Sch. Dist.*, 133 F.3d 649, 651 (8th Cir. 1998). This is because a local government cannot be held liable under § 1983 for an injury inflicted solely by its employees or agents on a theory of respondeat superior.  **See** *Andrews v. Fowler*, 98 F.3d 1069, 1074 (8th Cir. 1996) (**citing** *Monell v. Dep't of Social Servs. of New York*, 436 U.S. 658, 694 (1978)).

> The identification of an official policy as a basis upon which to impose liability ensures that a municipality is held liable only for constitutional deprivations "resulting from the decisions of its duly constituted legislative body or of those officials whose acts may fairly be said to be those of the municipality." Similarly, actions performed pursuant to a municipal "custom" not formally approved by an authorized decisionmaker "may fairly subject a municipality to liability on the theory that the relevant practice is so widespread as to have the force of law."

*Springdale*, 133 F.3d at 651 (**quoting** *Board of County Comm'rs of Bryan County, Okl. v. Brown*, 520 U.S. 397, 402-03 (1997)).

In conjunction with the above requirements under § 1983, the plaintiff has the same burden of showing a prima facie case of discrimination under Title VII and § 1983. *Richmond v. Bd. of Regents of Univ. of Minn.*, 957 F.2d 595, 598 (8th Cir. 1992).  The plaintiff does not present direct evidence of the defendants' discriminatory intent for his disparate treatment claims, accordingly, the court will evaluate the whether the plaintiff has created an inference of discrimination through the use of the burden-shifting framework set out by the *McDonnell Douglas* line of cases:

> [T]he elements of a prima facie discrimination claim are:  1) the employee belonged to a protected class; 2) [he] was qualified to perform [the] job [or meeting the employer's expectations]; 3) [he] suffered an adverse employment action; and 4) [he] was treated differently from similarly situated [persons outside the

> protected class].   The fourth element of a prima facie discrimination case also can be met if the employee provides some other evidence that would give rise to an inference of unlawful discrimination.   Once an employee establishes a prima facie case, the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for its actions, and then shifts back to the employee to show that the employer's reason was pretextual.

*Turner v. Gonzales*, 421 F.3d 688, 695 (8th Cir. 2005) (internal citations and quotations omitted); **see** *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973); *Taylor v. Southwestern Bell Tel. Co.*, 251 F.3d 735, 740 (8th Cir. 2001).

The defendants contend that although the plaintiff is a member of a protected class, he cannot establish any other element of a prima facie case of disparate treatment. Furthermore, the defendants argue they have shown their actions were based on legitimate, nondiscriminatory reasons which are not a pretext for discrimination.

The plaintiff alleges he suffered the adverse employment action of termination, which was the culmination of discriminatory and harassing conduct by the defendants.   The plaintiff also alleges he suffered disparate treatment in the manner the defendants failed to investigate or poorly investigated his complaints, then administered insufficient punishment on offending officers.   Incorporating the above allegations, the plaintiff argues there was a pattern of abusive conduct and harassment including 1) counseling for sick leave; 2) vandalism; 3) Sgt. Wheeler's threat; 4) accusations of excessive force in November 2003; 5) failing to respond to Code Blue; 6) accusations of excessive force in March 2004; 7) failing to train; and 8) failing to promote.   As discussed above, the plaintiff's allegations of discrimination for failing to promote him do not support his claims of discrimination.   The court will discuss each of the remaining allegations below.

### 1.      Counseling for Sick Leave

At all times relevant to this lawsuit the Department had a Sick Leave Committee who was charged with reviewing employees' sick leave usage.   **See** Filing No. 51, Exhibits 36, 38.   The sick leave policy provided for different levels of counseling and discipline depending on the frequency of sick leave incidents and whether the employee had been previously counseled or disciplined.   *Id.*   A first offense violation would result in the employee's supervisor having a discussion with the employee about the use of sick leave.

*Id.* p. 2. Additional violations may result in counseling by the Committee and disciplinary action, if appropriate. *Id.* The plaintiff was counseled twice about his use of leave time, but each was done only by his supervisor. The plaintiff was never required to meet with the Committee or attend a disciplinary hearing nor did he receive discipline.

In 2003, the sick leave policy provided for supervisor counseling when an employee had three incidents of sick leave on the same day of the week during a twelve-month period. **See** Filing No. 50, Exhibit 2 ¶ 13; Filing No. 51, Exhibit 36, p. 3. On November 24, 2003, the plaintiff was counseled for using four of six days of sick leave on the same day of the week (Sunday). **See** Filing No. 50, Exhibit 2 ¶ 14; Filing No. 51, Exhibit 37. The plaintiff does not deny he used the sick leave and he was given an opportunity to explain such usage.

In 2005, the sick leave policy provided for supervisor counseling when an employee had four unexcused (not excused with a physician's note) incidents of sick leave usage during a six-month period. When the Committee reviewed the plaintiff's sick leave usage in August of 2005, his Data Calendar showed seven incidents of unexcused sick leave usage for the preceding six-month period. Pursuant to the policy, the Committee requested that Sgt. Rogers discuss the matter with the plaintiff. Sgt. Rogers stated on the Sick Leave Counseling Record, dated August 8, 2005, that the plaintiff provided doctors' notes for the absences and that no action would be taken. **See** Filing No. 50, Exhibit 2 ¶¶ 15-17; Filing No. 51, Exhibits 38-39.

The plaintiff argues he had over 100 sick days accrued, at the time of his counseling, and that other officers without any sick leave available were not counseled. **See** Filing No. 68, p. 23. Additionally, the plaintiff contends the sick leave policy was selectively enforced to send a message to those who make complaints of discrimination, harassment or retaliation. *Id.* Finally, the plaintiff contends the counseling officer "browbeat" him and ignored his explanations for leave based on a work-related injury. *Id.*

The plaintiff provides no evidence to support these arguments made in his response brief. The plaintiff does not dispute the counseling was initiated in accordance with the Department's policy. The counseling incidents did not result in any material employment disadvantage to the plaintiff and do not rise to the level of adverse employment actions. The defendants provided a legitimate non-discriminatory reason to discuss sick leave with the plaintiff. Moreover, there is nothing about the nature or timing of the counseling

sessions which raises an inference they were conducted based on racial animus or as part of a pattern of harassment.

### 2.    Vandalism

On March 24, 2003, the plaintiff reported that his vehicle had been vandalized while parked at work.  The plaintiff did not identify any possible suspects in his written report. The parking lots in question are not secured and are accessible by the public.  There are cameras monitoring the lots but the cameras do not automatically record.  The plaintiff was told to contact the Omaha Police Department to file a report, which he did.  It is standard practice for the Department to refer employees to the Omaha Police Department when reporting vandalism to private vehicles.   If an employee had been identified as the perpetrator, disciplinary action would have been initiated.  However, no one was ever identified as the perpetrator.  **See** Filing No. 50, Exhibit 1 ¶ 12 and Exhibit 18.

The plaintiff alleges the March 24, 2003 vandalism of his vehicle is evidence of disparate treatment because a) the defendants failed to properly investigate the incidents, and b) the vandalism followed his complaints of discriminatory treatment.  The plaintiff also states he was not allowed to view surveillance videos.  The plaintiff contends he informed the defendants he suspected Officers Faircloth[2], Brammer and Sullivan vandalized his vehicle, but these officers were never questioned.  In fact, it is unclear, even to the plaintiff, whether these officers were involved in the vandalism.  The evidence from the plaintiff's deposition states he told "the lieutenants" from the Department about his suspicions about certain officers, however the lieutenants told the plaintiff that without evidence implicating the suspects they could not file a report against them.  **See** Filing No. 69, Exhibit 22 p. 38-40.  The plaintiff conceded he had no evidence against these officers and does not know if they vandalized his vehicle, but the plaintiff heard the suspected officers talking and laughing about the vandalism and they had asked the plaintiff "how is your car doing," the day after the incident.  **Id.** p. 38-39.  The plaintiff does not recall whether he told police officers about his suspicions.  **Id.**  The Omaha Police Department never identified who was responsible for the vandalism.

---

[2]  The plaintiff's brief and deposition have the suspect officer's name spelled as Furclough, however it appears by the context of the allegations that the plaintiff is referring to Officer Matthew Faircloth, who the plaintiff alleged was involved in the offensive January 20, 2003 telephone calls to the plaintiff.

The plaintiff fails to allege the defendants' conduct toward him, under the circumstances, was different from the manner in which the defendants would have responded to any vandalism which occurred in the parking lot.  The plaintiff does not dispute the defendants acted in accordance with standard practice.  Neither the vandalism nor its investigation resulted in any material employment disadvantage to the plaintiff and they do not rise to the level of adverse employment actions.  The defendants provided a legitimate non-discriminatory reason for their failure to investigate the matter internally.  Moreover, there is nothing about the nature of the vandalism or investigation which raises an inference they were conducted based on racial animus or as part of a pattern of harassment.

### 3.    Sgt. Wheeler's Threat

The plaintiff alleges that in early 2004 Sgt. Wheeler threatened to "kick his butt."  **See** Filing No. 69, Exhibit 22 p. 57-60.  In his deposition, the plaintiff stated he does not recall the circumstances around the incident but states he thinks it occurred due to a tension between himself and Sgt. Wheeler because the plaintiff had filed previous reports about Sgt. Wheeler and told Sgt. Wheeler that he (Sgt. Wheeler) was unethical.  *Id.*  In the plaintiff's brief, he states the incident was related to Sgt. Wheeler allowing Officer Frudicker to read a report the plaintiff wrote about Officer Frudicker.  **See** Filing No. 68, p. 25.  The plaintiff verbally reported the incident to his superiors who encouraged him to write a report, which he did.  **See** Filing No. 69, Exhibit 22 p. 57-60.  The plaintiff alleges the report was likely routed to the OPR, where Sgt. Wheeler worked, and the report vanished.  **See** Filing No. 68, p. 25.  There is no dispute the plaintiff did not report his allegation that the report was lost to the Department.  **See** Filing No. 69, Exhibit 22 p. 57-60.  The plaintiff did not file a second report when he learned the first had been lost or misplaced.  *Id.*

Neither the failure to investigate Sgt. Wheeler's conduct nor the conduct itself resulted in any material employment disadvantage to the plaintiff and therefore they do not rise to the level of adverse employment actions.  The plaintiff acknowledges the report was lost and he did not notify the defendants, which provides a legitimate non-discriminatory reason for their failure to investigate the matter internally.  Moreover, there is nothing about the nature of the conduct or failure to investigate which raises an inference they occurred based on racial animus or as part of a pattern of harassment.

4.      **Accusations of Excessive Force in November 2003**

On November 16, 2003, the plaintiff was involved in an incident with Inmate Johnson. The plaintiff completed a disciplinary misconduct report on the inmate, stating that when Inmate Johnson came at him, he "managed to grab [the inmate] by his neck and slam him on the floor." **See** Filing No. 50, Exhibit 1 ¶ 13; Exhibit 19. Inmate Johnson requested that law enforcement be contacted so he could file a criminal complaint against the plaintiff. **Id.** Exhibit 20. When an inmate requests to file a criminal complaint against an officer, it is standard procedure for the Department to contact the Douglas County Sheriff's Department. In this case the Sheriff's Department investigated the inmate's allegations but determined there was no cause for criminal charges to be brought against the plaintiff. **See** Filing No. 50, Exhibit 1 ¶ 14.

OPR investigated to determine whether any departmental rules or policies had been violated during the November 16, 2003 incident. Sgt. Carter, OPR Investigator, directed Sgt. Wilson to gather written reports from the inmates who witnessed the incident. After investigation, OPR notified the plaintiff he had been accused of violating departmental policy and that a pre-disciplinary hearing would be held to discuss the charges and his explanation of the same. After the pre-disciplinary hearing, the plaintiff was notified that the charges were not sustained and that no disciplinary action would occur. However, the plaintiff was told to attend retraining in use of force techniques. **See** Filing No. 50, Exhibit 1 ¶ 15 and Exhibit 21; Filing No. 51, Exhibit 22.

The plaintiff contends it is not "standard procedure" to contact the Sheriff's Office. As evidence of such contention, the plaintiff states that the Sheriff's Office investigated only four of eighty-six grievances filed by inmates. However, the plaintiff fails to provide any evidence the inmates who filed grievances also sought to press criminal charges, as was the situation with Inmate Johnson. Next, the plaintiff argues the defendants failed to request a criminal investigation of Inmate Johnson's conduct, as was previously done in an incident involving a white correctional officer, Officer Zach. However, the plaintiff fails to provide any evidence to support his statement. While the plaintiff states he asked for assault charges to be brought against Inmate Johnson, he admits Inmate Johnson did not actually touch the plaintiff, because the plaintiff moved out of the way, and the plaintiff did not sustain any injury during the incident. **See** Filing No. 69, p. 48-50.

Finally, the plaintiff states the investigation of the plaintiff's conduct led to inmates informing the plaintiff that Sgt. Wilson had threatened to "bring Martinez down." **See** Filing No. 70, Exhibit 36.   On November 28, 2003, the plaintiff filed a report informing the Department about the comments made by inmates, asking why Sgt. Wilson was investigating the plaintiff and seeking an investigation into Sgt. Wilson's conduct. ***Id.***  After the November 16, 2003 incident, the plaintiff states he requested that he not be assigned to work with Inmate Johnson because Inmate Johnson bragged about working with Lt. Craft to "bring Martinez down."   The plaintiff states he continued to be assigned to work with Inmate Johnson.

The defendants contend their response to the November 16, 2003 incident was reasonable to determine whether an employee violated any excessive use of force policies based on the plaintiff's admission of grabbing the inmate by his neck and slamming him to the floor.  The defendants explain Sgt. Wilson assisted in the collection of evidence at OPR Sgt. Carter's request due to a staffing shortage.  **See** Filing No. 50, Exhibit 1 ¶ 15.  The defendants argue there is no evidence to suggest the defendants' conduct was unreasonable, outside the normal practice of the Department or motivated by the plaintiff's race or national origin.

The plaintiff fails to allege the defendants' conduct toward him, under the circumstances, was different from the manner in which the defendants would have responded to any similar situation involving a correctional officer outside the plaintiff's protected class.  The defendants' failure to seek criminal charges against Inmate Johnson did not result in any material employment disadvantage to the plaintiff and therefore does not rise to the level of an adverse employment action.  Similarly, the investigation into Inmate Johnson's allegations found the allegations to be unfounded and the plaintiff provides no evidence he suffered any material employment disadvantage in his work assignments by continuing to be placed around Inmate Johnson.  There is nothing about the nature of the investigation into the November 16, 2003 incident which raises an inference it occurred based on racial animus or as part of a pattern of harassment.

In any event, the plaintiff acknowledged in his deposition that Lt. Selby may have initiated the Sheriff's Office investigation into the November 16, 2003 incident because Lt. Selby was angry with the plaintiff for the plaintiff's failure to translate for an inmate in June 2003.  **See** Filing No. 69, Exhibit 22 p. 40-42.  On November 25, 2003, the plaintiff filed a

report with the Department stating Lt. Selby told the plaintiff about the Sherifff's Office investigation, but did not want the plaintiff to misinterpret his actions as Lt. Selby was just following procedure. *Id.* Exhibit 32. At the time of the plaintiff's deposition, he stated Lt. Selby had been angry with the plaintiff and "was very different towards him" since June 2003. *Id.* Exhibit 22, p. 40. In June 2003, the plaintiff filed two reports describing an incident on June 12, 2003, when the plaintiff escorted an inmate to the medical department for testing and the nurse asked the plaintiff to translate for the inmate so an intake form could be completed. **See** Filing No. 69, Exhibits 28-29. The plaintiff refused to translate "for privacy reasons" and because "translating is not part of a correctional officers' duty." *Id.* The reports were written at the direction Lt. Selby because the medical department intended to write a report about the plaintiff and because Lt. Selby wanted to know who directed the plaintiff to refuse to translate. *Id.* The plaintiff maintained no one directed him to refuse. *Id.* Exhibit 29. Lt. Selby informed the plaintiff that if the plaintiff failed to write the second report (revealing the identity of whomever directed the plaintiff to refuse to translate), Lt. Selby would file a report against the plaintiff and speak to Sgt. Carter about the plaintiff. *Id.* There is no evidence Lt. Selby or the medical department filed a report against the plaintiff. The plaintiff's reports state the plaintiff asked Lt. Selby why Lt. Selby was "harassing" the plaintiff about translating, but there is no allegation of racial animus. Since the plaintiff acknowledges Lt. Selby may have been angry with the plaintiff for failure to translate and there is no evidence Lt. Selby was motivated by racial animus, the plaintiff has failed to show Lt. Selby's conduct during the investigation of the November 16, 2003 incident was based on the plaintiff's race or national origin.

### 5.    Failing to Respond to Code Blue

The plaintiff alleges that on March 7, 2004, he was confronted by a dangerous inmate and activated his "man down" system. **See** Filing No. 70, Exhibit 40. The plaintiff did not hear the Code Blue announced over the speaker system and no other officer responded. *Id.* The plaintiff was unable to use a radio in his location and called Central Control. *Id.* The Central Control officer told the plaintiff that she had announced the Code Blue, but the speaker system was not working. *Id.* Sgt. Cihak walked by and asked the plaintiff if there was a problem, then entered the inmate's cell to speak to the inmate in

private.  *Id.* and Exhibit 41.  The plaintiff alleged Sgt. Cihak acted unprofessionally by failing to allow the plaintiff to brief him prior to entering the inmate's cell.  *Id.*  The plaintiff did not allege the incident regarding the Code Blue or Sgt. Cihak's conduct was based on racial animus in either of the reports filed.  *Id.*

The plaintiff argues Sgt. Cihak failed to respond appropriately to the situation by investigating the lack of response to the plaintiff's call for assistance or disciplining the inmate.  The plaintiff alleges the inmate told the plaintiff that Sgt. Cihak was trying to gather information to get the plaintiff into trouble.  However, by the plaintiff's own account, Sgt. Cihak had the inmate transferred to another area after the incident.  **See** Filing No. 70, Exhibit 41.  The plaintiff does not dispute the speaker system was malfunctioning during the incident.

The plaintiff fails to allege the defendants' conduct toward him, under the circumstances, was different from the manner in which the defendants would have responded to any similar situation.  Sgt. Cihak assisted the plaintiff with the problem inmate and attempted to resolve the matter.  Neither the incident nor failure to respond as suggested by the plaintiff resulted in any material employment disadvantage to the plaintiff and they do not rise to the level of adverse employment actions.  Moreover, there is nothing about the nature or timing of the incident or investigation which raises an inference they occurred based on racial animus or as part of a pattern of harassment.

### 6.    Accusations of Excessive Force in March 2004

On March 29, 2004, the plaintiff was involved in an incident with Inmate Andrews. Officer Michael Wegner filed two Informational Reports.  **See** Filing No. 70, Exhibit 44; Filing No. 71, Exhibit 50.  The second report stated Officer Wegner witnessed the plaintiff hitting the inmate in the head.  **See** Filing No. 71, Exhibit 50.  During an April 6, 2004 interview of Officer Wegner, he stated the plaintiff hit Inmate Andrews at least twice, and kept hitting the inmate with his fists and elbows after the inmate was restrained.  *Id.* Exhibit 51.  Another witness, Nurse Deborah Brittenham, also reported she saw the plaintiff hitting the inmate with a closed fist.  *Id.* Exhibit 53.  On or about April 29, 2004, the OPR notified the plaintiff he had been accused of violating departmental policy and that a pre-disciplinary hearing would be held on May 7, 2004, to discuss the charges and his explanation of the

same. **See** Filing No. 51, Exhibit 25. On May 13, 2004, the plaintiff was terminated by Director Houston for violating departmental policy based on the unanimous recommendation of a disciplinary hearing committee. **See** Filing No. 50, Exhibit 1 ¶¶ 17-18; Filing No. 51, Exhibits 26-27. However, on September 23, 2004, the Douglas County Civil Service Commission found that the Department had failed to initiate disciplinary action against the plaintiff within 30 days as was required by his union contract and reinstated the plaintiff. **See** Filing No. 50, Exhibit 1 ¶ 17 [sic] (after ¶ 18); Filing No. 51, Exhibit 28.

The plaintiff contends he was treated differently than a similarly situated white male correctional officer because Officer Amweg, who was found guilty of using excessive force on an inmate on August 31, 2005, was only suspended for three days. **See** Filing No. 68, p. 11; Filing No. 71, Exhibit 57. The plaintiff provides no evidence of the circumstances surrounding the 2005 incident involving Officer Amweg or how the plaintiff determined Officer Amweg is similarly situated to the plaintiff. The evidence presented by the plaintiff does not show that the plaintiff and Officer Amweg were charged with the same violations, had the same violations sustained or engaged in similar conduct. *Id.* Accordingly, the court finds the plaintiff has failed to show he was treated differently than a similarly situated person outside his protected class. **See *Rodgers v. U.S. Bank, N.A.*,** 417 F.3d 845, 852 (8th Cir. 2005) (holding the plaintiff has to meet the low-threshold standard of showing he and the comparator were "involved in or accused of the same or similar conduct and [were] disciplined in different ways."); **see also *Tenge v. Phillips Modern Ag Co.*,** 446 F.3d 903, 910 (9th Cir. 2006).

Assuming the plaintiff has shown a prima facie case of discrimination with regard to the termination (or manner of investigation), the plaintiff alleges the investigation leading to his termination was suspicious, thus the defendants' stated reasons for the termination was pretext for racial discrimination. Specifically, the plaintiff states officers involved in the investigation were the same officers who had threatened to "take him down" during the Johnson investigation. Additionally, the plaintiff contends the reports written by Officer Wegner and Nurse Brittenham are unreliable. The plaintiff argues Officer Wegner's reports are unreliable because Officer Wegner wrote more than one report, only mentioning improper conduct in the second report, and Officer Wegner told the plaintiff Lt. Selby coerced him (Officer Wegner) and Nurse Brittenham into writing false reports. **See** Filing No. 68, p. 10 (brief); Filing No. 70, Exhibit 44; Filing No. 71, Exhibits 50, 52.

The plaintiff argues Nurse Brittenham's report is unreliable for several reasons. The plaintiff notes Nurse Brittenham's report of the March 29, 2004 incident was not written until May 3, 2004, and he contends her account is inconsistent with Officer Wegner's account. **See** Filing No. 71, Exhibit 53. The plaintiff also contends Nurse Brittneham was not present to witness what she says she saw. *Id.* Exhibits 51-52; Filing No. 69, Exhibit 22 p. 64-65. Further, Nurse Brittenham was terminated from her employment in June 2005 for falsification of patient records. *Id.* Exhibit 56.

The defendants contend there is nothing internally inconsistent about Officer Wegner's reports, although the later report provides additional information not included in the first. Any alleged inconsistency in the witnesses' reports (although the defendants contend there is no inconsistency) was evaluated by the disciplinary review panel before the plaintiff's termination. The defendants argue there is nothing suspicious about the manner in which the witnesses filed their reports, i.e., either several hours after the first or one month later. Further, with regard to Nurse Brittenham's report, the defendants state the Department relied on the accuracy of the report over one year before her termination for falsification of patient records, so her credibility would not have been reasonably questioned at the time of the plaintiff's disciplinary hearing.

Finally, the defendants contend the plaintiff has failed to provide evidence, other than his own assertions that the defendants manufactured any evidence of excessive force. The defendants provide evidence from Officer Wegner, in a report dated May 4, 2004, stating that Officer Wegner's March 29, 2004 incident report is accurate and was not coerced. **See** Filing No. 76, Exhibit 64. Officer Wegner explained the plaintiff approached Officer Wegner and tried to get Officer Wegner to say that Lt. Selby coerced Officer Wegner into writing a false report about the plaintiff. *Id.* Officer Wegner states he felt uncomfortable when approached by the plaintiff on two occasions about the March 29, 2004 incident and told the plaintiff what he (the plaintiff) wanted to hear, just to end the confrontations. *Id.* Sgt. Wheeler also asked Lt. Selby to respond to the plaintiff's allegation. *Id.* Exhibit 65. Lt. Selby denies ordering Officer Wegner or any nurse to write a report about the plaintiff striking an inmate. *Id.* Moreover, Lt. Selby states he was not present on the dates when the plaintiff alleges Lt. Selby was coercing Officer Wegner and Nurse Brittenham to write their reports. *Id.* and Exhibit 66 - shift schedule. In the plaintiff's

deposition he admits Lt. Selby could not have been involved and he did not think Lt. Selby was involved at the time.  **See** Filing No. 69, Exhibit 22 p. 67.

The plaintiff, a member of a protected class, was terminated from employment, which is an adverse employment action.  The plaintiff has failed to show a similarly situated person not of his protected was treated differently.   The defendants present ample evidence the termination decision was based on a legitimate non-discriminatory reason. The plaintiff has also failed to meet his burden of showing the defendants' stated reason for the termination, or the manner of the investigation, was pretext for discrimination. Neither falsity or racial animus can be inferred by the timing or content of the witness reports.  Similarly, the disciplinary committee had the benefit of all reports (contradictory or otherwise), but did not have information related to Nurse Brittenham's later falsification of records.  Even if the termination decision was incorrect, "the issue is whether [the defendant] conducted a thorough investigation and whether it made credibility determinations reasonably and in good faith."   ***Rodgers***, 417 F.3d at 855.  Here, the plaintiff failed to provide any evidence that the defendants did not believe the plaintiff was guilty of misconduct at the time of his termination.  **See *id.***  Similarly, the plaintiff has failed to provide evidence that any of the decision makers did not believe the plaintiff was guilty of misconduct at the time of his termination.  Accordingly, the plaintiff's allegations related to the accusations of excessive force in March 2004 do not support a claim for racial discrimination.

### 7.    Failing to Train

In the complaint, the plaintiff alleges he was required to attend a Pressure Point Control Tactic (PPCT) course and requested to take the course on February 13, 2003, but the defendants did not respond to his request.  **See** Filing No. 32, ¶¶ 26-27.  Additionally, the plaintiff alleges he was required to received a minimum of eighteen hours of in-service training each year, but did not receive any since his initial training in June 2002.  ***Id.*** ¶ 27. The plaintiff alleged non-Hispanic correctional officers who did not make national origin complaints or associate with the AACOA, had been re-certified in PPCT.  ***Id.*** ¶ 28.

The plaintiff also alleges he was scheduled for training in the Fall of 2004, but had to miss training due to the failure of his supervisors to properly remove him from the regular work schedule.  **See** Filing No. 71, Exhibits 54-55.  The plaintiff alleges he had several

problems with more than one of his superiors in attempting to schedule the training, which caused the plaintiff unnecessary stress and subjected him to hostility by his superiors. *Id.* Although the reports written by the plaintiff in October and November of 2004, do not allege the problems were based on racial animus, the plaintiff does state he was subjected to a "hostile work environment," yelled at and threatened to be written up for failure to obey orders. *Id.*

The defendants state the plaintiff received PPCT training in June of 2002 during his new hire orientation. **See** Filing No. 50, Exhibit 4 ¶ 5. Officers are re-certified with PPCT training on an annual basis and the plaintiff was due for re-certification in June of 2003. *Id.* ¶ 6. However, due to budget constraints, from approximately April of 2003 to March of 2004, the Department suspended PPCT re-certification training courses for all officers. *Id.* In March of 2004, PPCT re-certification training was re-instituted. *Id.* ¶ 7. In March of 2004, the plaintiff was assigned to the B Shift, whose PPCT training was scheduled for May and June of 2004. *Id.* However, the plaintiff was terminated prior to being scheduled for the training. After the plaintiff's reinstatement, he was placed on a training schedule. *Id.* ¶ 8. The defendants argue the plaintiff has failed to allege any other officer, not in the plaintiff's protected class, received more favorable treatment than the plaintiff.

With regard to the allegations of discriminatory failure to train in the plaintiff's complaint, the plaintiff fails to provide any evidence or comparator information showing he was treated differently than others. Additionally, defendants provide undisputed evidence there was no training for any correctional officer during the specified period. With regard to training in the fall of 2004, the plaintiff fails to allege the defendants' conduct toward him was different from any typical scheduling problems or mistakes. The plaintiff admits his difficulty with scheduling for training was ultimately resolved and the plaintiff received the necessary training. Neither difficulty with training resulted in any material employment disadvantage to the plaintiff and they did not rise to the level of adverse employment actions. Although, the plaintiff had been recently reinstated to his position in the fall of 2004, the reason for his reinstatement was due to a procedural error made by the defendants, rather than in conjunction with any complaints of discriminatory conduct. Further, the scheduling problems which occurred in the fall of 2004 could not have been part of a pattern culminating in his termination because the scheduling problems occurred after the plaintiff's reinstatement. In sum, there is nothing about the nature or timing of the

incidents relating to failure to train which raise an inference they occurred based on racial animus or as part of a pattern of harassment.

### 8.    Pattern of Abusive Conduct

As stated above, the court finds the plaintiff has failed to show any of the alleged improper treatment supports his claims for discriminatory disparate treatment.  Similarly, the plaintiff's treatment over the course of his employment does not support his claims. The plaintiff has also failed to show the sum of the plaintiff's allegations of improper treatment are connected in any way to his termination, or the investigation leading to the termination.  **See** ***Green v. Franklin Nat'l Bank of Minneapolis***, 459 F.3d 903, 913 (8th Cir. 2006).  Here, none of the employees who allegedly treated the plaintiff differently, or with harassing conduct, had any role in the termination.  "Without that connection, the claims of differential treatment cannot support an inference of discriminatory intent."  ***Id.***

### D.    Retaliation

In the Second Claim for Relief, the plaintiff alleges the defendants engaged in illegal retaliation, in violation of 42 U.S.C. § 2000e-2(a), against him when he engaged in the protected activities of reporting the incidents described herein and by his association with the AACOA.  **See** Filing No. 32, p. 11.  The plaintiff contends that after his first complaints of racial harassment on January 12, 2003 and January 17, 2003, all subsequent incidents, as discussed above, was a pattern of continuing harassment culminating in the plaintiff's termination.  **See** Filing No. 68, p. 29-36.

"An employee can prove retaliation through circumstantial evidence, using the ***McDonnell Douglas*** burden-shifting analysis."  ***Hite v. Vermeer Mfg. Co.***, 446 F.3d 858, 865 (8th Cir. 2006).  The plaintiff must establish a prima facie case of retaliation discrimination by showing he engaged in statutorily protected activity, he suffered an adverse employment action, and that there was a causal connection between his exercise of rights and the adverse employment action.  ***Id.***  If shown, "the burden shifts to the employer to article a legitimate, nondiscriminatory reason for its actions."  ***Id.***

> Finally, the burden shifts back to the employee to demonstrate that the "employer's proffered reason is pretextual."  The employee must present evidence that "(1) creates a question of fact regarding whether [the defendant's] reason was

> pretextual and (2) creates a reasonable inference that [the defendant] acted in retaliation."

*Id.* (internal citations omitted).

Under circumstances where the plaintiff relies on temporal proximity alone to establish causation, the timing between the protected activity and retaliatory conduct must be "very close." *Id.* at 866. However, "[a] pattern of adverse actions that occur just after protected activity can supply the extra quantum of evidence to satisfy the causation requirement." *Id.* (citation omitted). The plaintiff may also rely on the employer's discriminatory comments when made by an ultimate decision maker or with evidence of the decision maker's reliance on the discriminatory comments of another. *Id.*

In this case, the plaintiff fails to provide any evidence of causation. The plaintiff alleges the retaliatory conduct began on January 20, 2003, with the anonymous telephone calls and continued over the course of seventeen months with many separate incidents leading to the plaintiff's termination after the suspicious investigation into the March 29, 2004 Andrews incident. However, none of the employees who allegedly treated the plaintiff with racial animus, or with harassing conduct, was a decision maker in the termination. Further, the plaintiff alleges only a series of well spaced incidents, which have no causal link with each other or the plaintiff's termination. Neither the timing or nature of the events provides the causal link necessary help the plaintiff sustain his burden of proof. In any event, as stated above, the defendants have shown a legitimate non-discriminatory basis for each of its decisions, including the termination. Furthermore, the plaintiff has failed to present evidence of pretext. Accordingly, the plaintiff's retaliation claim must be dismissed.

## E.    Hostile Work Environment

In the Fourth Claim for Relief, the plaintiff alleges the defendants, in their official capacities, subjected the plaintiff to a hostile work environment because the defendants knew of the alleged unlawful conduct and failed to take proper remedial action and/or intervene. **See** Filing No. 32, p. 12. This claim is alleged pursuant to Title VII, 42 U.S.C. § 2000e-2(a).

In order to establish a claim of hostile work environment, the plaintiff has the burden of showing (1) he belonged to a protected class; (2) he was subjected to unwelcome harassment; (3) the harassment was based upon his protected class status; (4) the

harassment affected a term, condition, or privilege of his employment; and (5) the employer knew or should have known of the harassment and failed to take proper remedial action to end or alleviate the harassment.  *Green v. Franklin Nat'l Bank of Minneapolis*, 459 F.3d 903, 910 (8th Cir. 2006).

### 1.    Unwelcome Conduct

When viewing the underlying wrongful conduct such conduct "must be sufficient to create a hostile environment, both as it would be viewed objectively by a reasonable person and as it was actually viewed subjectively by the victim."  *Id.* (**quoting** *Howard v. Burns Bros., Inc.*, 149 F.3d 835, 840 (8th Cir. 1998)).  A hostile work environment is defined as a workplace "permeated with 'discriminatory intimidation, ridicule, and insult,' that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'"  *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (**quoting** *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 65, 67 (1986)).

> "Unquestionably, a working environment dominated by racial slurs constitutes a violation of Title VII."  We also consider physical threats in conjunction with racial harassment in determining whether a hostile work environment exists. However, if the comments are "[s]poradic or casual," they are unlikely to establish a hostile work environment claim. Frequency of harassment is a factor, but even infrequent conduct can be severe enough to be actionable.

*Green*, 459 F.3d at 911-12 (eight alleged instances of racially insensitive terms in a three months is actionable) (internal citations omitted); *Reedy v. Quebecor Printing Eagle, Inc.*, 333 F.3d 906, 908-09 (8th Cir. 2003) (five incidents of harassment within seven months was actionable).

The defendants contend the plaintiff cannot show the alleged unlawful conduct, the racial slurs in January 2003, were sufficiently severe or pervasive as to effect a term or condition of the plaintiff's employment.  **See** Filing No. 52, p. 30-32.  In the alternative, the defendants argue they responded with prompt and reasonable remedial action.  *Id.* p. 30, 32-34.  In reply, the plaintiff argues the issue is one of disputed material facts for a jury to determine.  Specifically, the plaintiff contends the January 2003 incidents were not the only incidents which should be considered for the plaintiff's hostile work environment claim.  The plaintiff provides the following list of additional incidents for consideration:

1.    The plaintiff's vehicle was vandalized twice on March 24, 2003.
2.    Suspicious reports were filed accusing the plaintiff of various forms of misconduct.[3]
3.    The plaintiff was falsely accused of using excessive force on Inmate Johnson on November 16, 2003.
4.    The plaintiff was denied promotions for which he was qualified.[4]
5.    In early 2004, Sgt. Wheeler, an officer assigned to the OPR, physically threatened the plaintiff and the report the plaintiff filed about the threat was lost.
6.    The plaintiff called for a Code Blue on March 7, 2004, and no one responded. When Sgt. Cihak walked by he ignored the plaintiff and tried to collect a damaging statement from the inmate about the plaintiff.
7.    The plaintiff was falsely accused of using excessive force on Inmate Andrews, on March 29, 2004.
8.    Suspicious reports, which implicated the plaintiff, were solicited after the March 29, 2004 incident with Inmate Andrews.

**See** Filing No. 68, p. 37-38.

Furthermore, the plaintiff states he went to work each day wondering whether he would be harassed or attacked by his co-workers, other officers would respond to a Code Blue, he would be overlooked for promotion, or his vehicle would be vandalized. The plaintiff states he lost faith in the system.

Although "[a]ll instances of harassment need not be stamped with signs of overt discrimination to be relevant under Title VII." ***Carter v. Chrysler Corp.***, 173 F.3d 693, 701 (8th Cir. 1999). Such harassment must be "part of a course of conduct which is tied to evidence of discriminatory animus." ***Id.*** For example, "racial epithets are often the basis for racial harassment claims . . . and may likewise create an inference that racial animus motivated other conduct as well." ***Id.***

The plaintiff fails to provide any evidence showing the alleged harassing conduct, aside from the January 2003 incidents, was either overtly discriminatory or part of a course of conduct tied to evidence of discriminatory animus. Additionally, neither the timing of the incidents nor the identity of the alleged perpetrators create an inference the conduct was racially motivated. The January 2003 incidents, while inappropriate, were offhand

---

[3] It appears from the context of the plaintiff's brief that he is referring to the investigations conducted by Sgts. Wilson and Wheeler into the incidents involving Inmate Johnson and Inmate Andrews and the reports filed in conjunction with the incident involving Inmate Andrews. **See** Filing No. 68, p. 10, 20-22, 27-28, 32, 35, and 40-41.

[4] The plaintiff does not allege he was denied promotions other than the two discussed above in Section A.

comments and isolated incidents of offensive conduct by different individuals.  **See *Gordon v. Shafer Contracting Co., Inc.*,** 469 F.3d 1191, 1195 (8th Cir. 2006) (three or four racially offensive comments made by single supervisor insufficient to create hostile work environment).  Accordingly, the court finds the plaintiff fails to show the workplace was permeated with discriminatory intimidation, ridicule, and insult, sufficiently severe or pervasive to alter the conditions of his employment and create an abusive working environment.

### 2.    Prompt Remedial Measures

It is the plaintiff's burden to "show that [the defendant] knew or should have known about the harassment and failed to take prompt remedial action reasonably calculated to stop the harassment."   *Carter*, 173 F.3d at 702.   Factors used to assess "the reasonableness of remedial measures may include the amount of time that elapsed between the notice and remedial action, the options available to the employer, [such as] employee training sessions, transferring the harassers, written warnings, reprimands in personnel files, or termination, and whether or not the measures ended the harassment."  *Id.* (internal citations omitted); *Green*, 459 F.3d at 912 (holding investigation and termination of employee using racially insensitive terms and verbal threats within one month of formal complaint was prompt).

The plaintiff alleges the defendants failed to investigate the plaintiff's numerous complaints, including his complaints about Sgts. Wilson and Wheeler collecting suspicious reports against the plaintiff, during the incidents involving Inmates Johnson and Andrews, and Sgt. Wheeler's threat.  Further, the plaintiff states that when the defendants did investigate his reports, such investigations were perfunctory and any punishments were insufficient.  The plaintiff argues the harassment increased in intensity culminating in his termination.   Additionally, an officer assigned to the OPR orchestrated additional harassment by threatening the plaintiff and coercing others to file suspicious reports implicating the plaintiff in misconduct.  Finally, the plaintiff contends the perpetrators who engaged in offensive racially motivated conduct in January 2003 were not reasonably punished, and the perpetrators of the vandalism were not identified.

At all times relevant, the Douglas County Civil Service Commission had an "Equal Employment Opportunity" policy applicable to all civil service employees.  **See** Filing No.

50, Exhibit 1 ¶ 5 and Exhibit 5.  The policy provided a complaint mechanism for employees and provided for disciplinary action for any employee who violated the policy.  *Id.*  In addition, all corrections officers were required to review the policy during their initial training and a copy of the policy is available at the Department.  *Id.*  In October of 2003, the Department adopted its own discrimination and harassment policy.  *Id.* Exhibit 1, ¶ 6 and Exhibit 6.

The defendants allege that during the plaintiff's employment, the plaintiff reported three incidents of racial harassment.  **See** Filing No. 50, Exhibits 7, 12 and 14.  One of the incidents was related to the plaintiff by another employee.  *Id.* Exhibit 12.  The incidents occurred in January of 2003.  In addition, in March of 2003, the plaintiff reported that his vehicle was vandalized, but did not state this was due to his race or national origin.  *Id.* Exhibit 18.  The defendants argue these instances, taken together are not severe or pervasive enough to constitute a hostile work environment because none of the conduct was so extreme as to constitute a change in the plaintiff's terms or conditions of employment.

The defendants also argue the OPR promptly and thoroughly investigated the three complaints made by the plaintiff in January 2003.  The defendants state reports were collected from all known witnesses and in two of the incidents the perpetrators were identified.  The two employees were disciplined according to the Civil Service Guidelines.  **See** Filing No. 50, Exhibit 5 p. 8-13 and Exhibits 9, 13.  The alleged perpetrator was not disciplined with respect to the third incident, on January 20, 2003, because there was not sufficient evidence against either Officer Faircloth or Officer Brammer.  *Id.* Exhibit 17.  The defendants contend failure to discipline in relation to the third complaint does not mean the Department conducted an unreasonable investigation into the matter.  The plaintiff did not complain of any further racially motivated harassment by these three individuals, or any other employees.  Accordingly, the defendants contend they took all reasonable and prompt actions available to prevent and remedy racially motivated harassment against the plaintiff.

In this case, the plaintiff made three complaints alleging racially motivated harassment, in the form of racial epithets, in January 2003.  The defendants investigated the conduct within days of the plaintiff's reports and the offending officers were punished in accordance with the Department's written EEO policy.  Although no officer was punished

for the third incident, the Department promptly investigated the allegations, but determined they did not have enough evidence to penalize any particular officer. The failure to determine and punish a perpetrator is not required to relieve the employer of liability. **See Robinson v. Valmont Indus.**, 238 F.3d 1045, 1047-48 (8th Cir. 2001). In any event, the plaintiff did not make any additional complaints, after January 2003, to the Department about racially motivated harassment.

The plaintiff now claims other harassment occurred based on his race or national origin. However, the evidence before the court does not support the plaintiff's allegations that the defendants knew or should have known the plaintiff felt the harassment was racially motivated. For example, the plaintiff alleges he told the defendants he suspected Officers Faircloth[5], Brammer and Sullivan vandalized his vehicle on March 24, 2003. While the investigation into the January 20, 2003 anonymous phone calls included questioning both Officers Faircloth and Brammer, the plaintiff did not allege the incident two months later was racially motivated. In fact, it is unclear, even to the plaintiff, whether these officers were involved in the vandalism. The evidence from the plaintiff's deposition states he told "the lieutenants" from the Department about his suspicions about certain officers, however the lieutenants told the plaintiff that without evidence implicating the suspects they could not file a report against them. **See** Filing No. 69, Exhibit 22 p. 38-40. The plaintiff conceded he had no evidence against these officers and does not know if they vandalized his vehicle, but the plaintiff heard the suspected officers talking and laughing about the vandalism and they had asked the plaintiff "how is your car doing," the day after the incident. **Id.** p. 38-39.

As to the other alleged harassment, while the plaintiff may have reported certain conduct, there is no evidence the plaintiff ever reported that it was racially motivated. Neither the plaintiff's conflict with Sgt. Wheeler nor do the other allegations have any of the traditional marks of racial harassment. The alleged conduct may have been unprofessional, but there is no link to racial animus. The court cannot hold the defendants liable for conduct that was never reported or never reported as racially motivated. The timing of the alleged conduct several months or more than a year following racial epithets

---

[5] The plaintiff's brief and deposition have the suspect officer's name spelled as Furclough, however it appears by the context of the allegations that the plaintiff is referring to Officer Matthew Faircloth, who the plaintiff alleged was involved in the offensive January 20, 2003 telephone calls to the plaintiff.

made by other officers or unidentified officers does not create an inference that racial animus motivated the later conduct as well.  The plaintiff does not attempt to discredit the promptness of the defendants' actions regarding the January 2003 incidents.  While the plaintiff does dispute the adequacy of the defendants' responsiveness with regard to other incidents, such incidents were not reported to the defendants as racially motivated, nor did the plaintiff appear to suffer harassment by the perpetrators of the January 2003 incidents. Accordingly, the defendants' motion for summary judgment should be granted on the claim for hostile work environment because the defendants took prompt and proper remedial action with regard to all racial harassment they knew or should have known about.  Upon consideration,

**IT IS ORDERED:**

1.      The defendants' Motion for Summary Judgment (Filing No. 49) is granted.

2.      This action and the plaintiff's Amended Complaint are dismissed with prejudice.

3.      Pursuant to Fed. R. Civ. P. 58, a separate judgment will be entered on this date in accordance with this Order.

DATED this 30th day of April, 2007.

BY THE COURT:

 s/Thomas D. Thalken
United States Magistrate Judge